**POARCH BAND OF CREEK INDIANS, Plaintiff,**

v.

**STATE OF ALABAMA and Guy Hunt, Governor of the State of Alabama, Defendants.**

**Civ. A. No. 91–0757–AH–M.**

United States District Court, S.D. Alabama, S.D.

Oct. 30, 1991.

Richard T. Dorman, McRight, Jackson, Dorman, Myrick & Moore, Mobile, Ala., for plaintiff.

Carol Jean Smith, Alabama State House, Montgomery, Ala., for the State of Ala.

Fred Fohrell, Montgomery, Ala., for the Governor.

HOWARD, Chief Judge.

## ORDER

This matter is before the Court on the Motion to Strike of defendant Guy Hunt [Doc. # 4], the Motion to Dismiss of the defendant State of Alabama [Doc. # 6], and the plaintiff's Motion to Amend Complaint [Doc. # 12].

A hearing was held in this Court on the State of Alabama's Motion to Dismiss on October 17, 1991. The Court has fully reviewed the Motion to Dismiss, the briefs and evidentiary materials filed in support of and in opposition to the motion, and all other relevant materials in the file. For the reasons that follow, the Court concludes that the State of Alabama's Motion to Dismiss [Doc. # 6] should be GRANTED. The Court also concludes that the Governor's Motion to Strike [Doc. # 4] should be DENIED and the plaintiff's Motion to Amend Complaint [Doc. # 12] should be GRANTED.

## I. THE INDIAN GAMING REGULATORY ACT

The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA") sets out "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal government." 25 U.S.C. § 2702(1) (West Supp. 1991). The IGRA provides that "[a]ny State and Indian Tribe may enter into a Tribal–State compact governing gaming activities on the Indian lands of the Indian tribe," and that upon receiving a request from an Indian tribe "the State shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A) & (B) (West Supp.1991).

The IGRA divides Indian gaming into three classes and establishes a National Indian Gaming Commission within the Department of the Interior to monitor and regulate Indian Gaming. *See* 25 U.S.C. §§ 2704–08 (West Supp.1991). Class I includes social games solely for prizes of minimal value and traditional forms of Indian gaming engaged in by individuals in connection with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6) (West Supp. 1991). Class II includes bingo and non-banking card games, as well as banking card games operated on or before May 1, 1988. 25 U.S.C. § 2703(7) (West Supp. 1991). Class III includes all other forms of gaming. 25 U.S.C. § 2703(8) (West Supp. 1991). Class I gaming on Indian lands is within the exclusive jurisdiction of the tribes. 25 U.S.C. § 2710(a)(1) (West Supp. 1991). Class II gaming is within the jurisdiction of the tribes, but is subject to the IGRA. 25 U.S.C. § 2710(a)(2) (West Supp. 1991). A tribe may engage in or license or regulate class II gaming if the state permits such gaming for any purpose by any person and such gaming is not specifically prohibited on Indian lands by federal law and the governing body of the tribe adopts an ordinance or resolution which is approved by the Chairman of the National Indian Gaming Commission. 25 U.S.C. § 2710(b)(1)(A) & (B) (West Supp.1991). Class III gaming activities are lawful only if they are authorized by a tribal resolution approved by the Chairman, located in a state that permits such gaming for any purpose by any person, and conducted in conformance with a tribal-state compact. 25 U.S.C. § 2710(d)(1)(A)–(C) (West Supp. 1991). *See* 42 C.J.S. *Indians* § 64 (1991).

## II. PROCEDURAL HISTORY OF THIS CASE

The Poarch Band of Creek Indians (the "Tribe") filed this suit under the IGRA against Governor Guy Hunt (the "Governor") and the State of Alabama (the "State" or "Alabama") on September 11, 1991, alleging that more than 180 days had passed since the Tribe requested the State to negotiate with it regarding Class III gaming and that the State failed to enter into a compact within the one-year time limit provided by statute.

The Tribe's claim for relief asks for judgment as follows:

1. Declaring that the Gaming Act requires Alabama to permit all Class III gaming (except for a lottery which is expressly prohibited by the Constitution of Alabama), including but not limited to, raffles, pari-mutuel betting, video games of chance, fascimile slot machines, non-bank and bank card games, blackjack, baccarat and chemin de fer, roulette, craps, keno, bingolet, bingo jack, bingo craps, fascimile machine poker, horse and dog racing, simulcasting of horse and dog races and other sporting events, and related games, when defined as Class III gaming, be included in the Compact;

2. Entering an order directing the Governor (on behalf of the State) and the Tribe to sign within 14 days the Tribe's last proposed Compact (except for the present locations being the tribal lands in Escambia and Elmore counties as agreed) on the ground that said Compact best comports with the terms of the Gaming Act and applicable Federal law concerning the conduct of Class III gaming activities on tribal lands, pursuant to 25 U.S.C. § 2710(d)(7)(B)(iv).

3. Awarding plaintiff its costs and disbursements herein, including attorney's fees; and

4. Awarding plaintiff such other and further relief as this Court deems just, including, but not limited to, such additional declaratory or injunctive relief as may be necessary to effectuate the purposes of the Gaming Act.

[Plaintiff's Complaint, pp. 15–16]

The Governor answered and filed a motion to strike allegations of good or bad faith on the part of any of the parties as irrelevant. [Doc. # 4] The State answered and filed a motion to dismiss based on sovereign immunity under the Eleventh Amendment or for improper venue. [Docs. ## 5–6]

On October 11, 1991, the plaintiff moved the Court to amend its complaint to request the following relief:

1) an order by this Court requiring good-faith negotiations for a time period of up to sixty (60) days between the Governor and the Tribe to agree on a compact;

2) in the event a compact is not reached, an order by this Court requiring a subsequent mediation process of up to, but not exceeding, sixty (60) days; and

3) subsequent procedures as set forth in the IGRA.

[Motion to Amend Complaint, Doc. # 12, pp. 2–3]

## III. THE STATE OF ALABAMA'S MOTION TO DISMISS

The Eleventh Amendment to the Federal Constitution provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. While the amendment does not explicitly refer to suits against a state by one of its own citizens, such suits are barred by the amendment. *Hans v. State of Louisiana,* 134 U.S. 1, 21, 10 S.Ct. 504, 509, 33 L.Ed. 842 (1890); *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142,

3145, 87 L.Ed.2d 171 (1985). In fact, as the United States Supreme Court recently explained,

[d]espite the narrowness of its terms, since *Hans v. Louisiana* we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact; that the judicial authority in Article III is limited by this sovereignty; and that a state will therefore not be subject to suit in federal court unless it has consented to suit, either expressly or in the "plan of the convention."

*Blatchford v. Native Village of Noatak,* —— U.S. ——, ——, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686 (1991) (citations omitted).

The Eleventh Amendment does not act as a complete bar to all suits against a state, and there are three well-recognized exceptions. First, a state may consent to suit and in so doing waive the protection against suit afforded it by the Eleventh Amendment. Second, Congress can, under some circumstances, abrogate a state's Eleventh Amendment immunity. Finally, the *Ex Parte Young* doctrine, resting on an *ultra vires* theory, permits suits against state officials in their official capacities to obtain prospective injunctive relief in order to promote the vindication of federal rights.

An examination of each of these potential exceptions reveals that none of them are applicable in this case and that the Eleventh Amendment remains as a bar to this action against the State of Alabama.

### A. *Consent/Waiver*

The Supreme Court has explained that "States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.' The Federalist, No. 81." *Monaco v. Mississippi,* 292 U.S. 313, 322–23, 54 S.Ct. 745, 747–48, 78 L.Ed. 1282 (1934); *See also Penn-*

*hurst State School and Hospital v. Halderman,* 465 U.S. 89, 98–100, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984). There are thus two forms of consent: An explicit consent by the state to a particular lawsuit against it and that consent deemed given by the state when it joined the Union and adopted the United States Constitution.

### 1. Express Consent or Waiver

■ The first type of consent is explicit case-by-case consent and presents no federal constitutional problems when properly given. *See, e.g. Petty v. Tennessee–Missouri Bridge Com'n,* 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); *Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 883, 27 L.Ed. 780 (1883). Express consent must be through legislative enactment, *Carr v. City of Florence, Ala.,* 916 F.2d 1521, 1524 (11th Cir.1990), and the mere failure by a state to raise the Eleventh Amendment as a defense in the trial court does not waive it. *Edelman v. Jordan,* 415 U.S. 651, 677–78, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974).

■ The plaintiff asserts that the State of Alabama has expressly consented to this suit. According to its brief, the plaintiff Indian Tribe was considering filing suit solely against the Governor and only added the State as a party because the Attorney General's office took the position that if the State was not named a party, then the Attorney General's office would seek to intervene in this lawsuit on behalf of the State. The plaintiff also finds consent to suit in the fact that the State entered into compact negotiations with the Indian tribe.

It might be difficult to determine whether either of these actions by the State of Alabama could aptly be characterized as an "intentional relinquishment" of its constitutional right not to be sued without its consent, *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), but this Court is spared such a difficult determination by the requirement that a

state's consent or waiver come by way of legislative enactment. *Carr,* 916 F.2d at 1524. There has been no consent to suit or waiver of Eleventh Amendment immunity by the Alabama legislature in this case, and accordingly there is no express consent or waiver by the State of Alabama.[1]

### 2. Consent Inherent in the Plan of the Convention

■ The second type of consent, that inherent "in the plan of the convention," has been found to exist in several situations. One is a waiver of immunity against suits by the United States. *United States v. Mississippi,* 380 U.S. 128, 140–41, 85 S.Ct. 808, 814–15, 13 L.Ed.2d 717 (1965); *United States v. Texas,* 143 U.S. 621, 641–46, 12 S.Ct. 488, 492–94, 36 L.Ed. 285 (1892). Another is a waiver of immunity against suits by other states. *South Dakota v. North Carolina,* 192 U.S. 286, 24 S.Ct. 269, 48 L.Ed. 448 (1904).

The plaintiff asserts that this second type of consent removes the Eleventh Amendment as a bar to this action, arguing that the action is in essence one by the United States to which the State is not immune. The plaintiff points out that under the IGRA, the United States Secretary of the Interior may file suit against a State to enforce the mediation process set forth in the IGRA. *See* 25 U.S.C. §§ 2710(d)(7)(B)(vii) & (A)(iii). From this statutory provision and *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), the plaintiff concludes that the partnership between the Tribe and the United States in the judicial dispute resolution process makes the suit in reality one by the United States to which Alabama has no immunity.

In *Moe,* the Supreme Court held that a suit by an Indian tribe challenging a Montana statutory scheme for assessment and collection of personal property taxes was not barred by a statute prohibiting district courts from enjoining collection of state

---

**1.** Whether such a legislative enactment could function as a valid express consent to suit is also a difficult question. *See* Ala.Const. of 1901, Article I, section 14 ("the State of Alabama shall

never be made a defendant in any court of law or equity."); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978).

taxes. That jurisdictional rule provided that

> "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341.

*Moe,* 425 U.S. at 470, 96 S.Ct. at 1640. The Court found that the legislative history to the subsequently enacted 28 U.S.C. § 1362, a statute providing federal courts with general jurisdiction over civil actions brought by Indian tribes, indicated "a congressional purpose to open the federal courts to the kind of claims that could have been brought by the United States as [the tribe's] trustee, but for whatever reason were not so brought." *Id.* at 472, 96 S.Ct. at 1640. The Court examined the cause of action at issue and concluded:

> Here the United States could have made the same attack on the State's assertion of taxing power as was in fact made by the tribe.... We think that the legislative history of § 1362, though by no means dispositive, suggests that in certain respects tribes suing under this section were to be accorded treatment similar to that of the United States had it sued on their behalf.

*Id.* at 474, 96 S.Ct. at 1641–42 (citations and footnotes omitted).

This Court finds *Moe* distinguishable on two grounds. First, it was important in *Moe* that the United States as the tribe's trustee could have brought the same action that the tribe was bringing. In the instant case, the same is not true. Under the IGRA, the Secretary of the Interior may institute a cause of action in Federal District Court to enforce the procedures prescribed under 25 U.S.C. § 2710(d)(7)(B)(vii). 25 U.S.C. § 2710(d)(7)(A)(iii) (West Supp. 1991). Subparagraph (B)(vii) requires the Secretary to prescribe procedures to enforce the result of mediation under 25 U.S.C. § 2710(d)(7)(B)(iv). This authorization of suit by the Secretary does not enable him to bring the instant action on behalf of the tribe, but to bring an action

which cannot be brought until after the instant action.

The IGRA allows an Indian tribe to sue a state after the expiration of 180 days from the tribe's request for the state to enter into negotiations. 25 U.S.C. § 2710(d)(7)(B)(i) (West Supp.1991). If the court at that time finds that the state has failed to negotiate in good faith with the Indian tribe to conclude a Tribal–State compact governing the conduct of gaming activities, the court shall order the state and the Indian tribe to conclude such a compact within sixty days. 25 U.S.C. § 2710(d)(7)(B)(iii) (West Supp.1991). If the state and the tribe fail to conclude a compact within the 60–day period, the court then appoints a mediator to select from proposals each submits. 25 U.S.C. § 2710(d)(7)(B)(iv) (West Supp.1991). The mediator's selection becomes the Tribal–State compact if the state consents to it within 60 days. 25 U.S.C. § 2710(d)(7)(B)(vi) (West Supp.1991). If the state does not consent, then the situation arises where the Secretary of the Interior must prescribe procedures to effectuate the compact selected by the mediator and may bring an action to enforce it. At no point prior to the state's failure to consent to a compact selected by a court-appointed mediator is the Secretary entitled to bring an action on behalf of the Indian tribe. This instant action has not reached a point where the Secretary becomes involved so that, unlike *Moe,* the plaintiff Indian tribe is not representing the United States. For that reason, *Moe* does not require a holding that this action involves Alabama's consent inherent "in the plan of the convention."

Moreover, *Moe* is distinguishable on another ground. *Moe* involved clothing an Indian tribe with the litigation privileges of the United States when there was a federal statutory bar to suit. Here, there is no mere statutory bar, but the bar of the Eleventh Amendment to the Federal Constitution. In this context, the plaintiff's theory seems to have been rejected by the United States Supreme Court in *Employees of Dept. of Public Health & Welf. v. Missouri,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). In *Employees,* the

Court held that a state could not be sued by its employees for overtime compensation under the Fair Labor Standards Act. Section 16(c) of the FLSA gave the Secretary of Labor authority to bring such a suit, but the Court did not even suggest that such an arrangement turned the suit by the employees into one "in essence" by the United States. On the contrary, the Court used the fact that the Secretary had authority to enforce the FLSA to bolster its conclusion that Congress did not intend to allow individuals to sue a state. *Id.* at 285–86, 93 S.Ct. at 1618.

### 3. *Parden* and its Progeny

■ The plaintiff also finds Alabama's consent to suit under a third theory, that of *Parden* and its progeny, perhaps more properly viewed as a species of the consent inherent in the plan of the convention theory. The Tribe argues that the State of Alabama accepted the benefits of the Indian Gaming Regulatory Act, federal legislation the Tribe claims clearly conditions participation in the federal program on a waiver of sovereign immunity.

In *Parden v. Terminal Railway*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), the Supreme Court held that a State as owner and operator of a railroad may not plead sovereign immunity when it is sued under the Federal Employers' Liability Act. The Court held that "Alabama, when it began operation of an interstate railroad approximately 20 years after enactment of the FELA, necessarily consented to such suit as was authorized by that Act." *Id.* at 192, 84 U.S. at 1213. Thus, under *Parden*, when a state chooses to engage in a business that is regulated by the Federal Government pursuant to the Commerce Clause of the Federal Constitution, that State is deemed to have consented to the federal regulation that comes with the territory—including lawsuits by private parties. Incidentally, the State of Alabama has not engaged in the gambling business.

Later cases have not read the *Parden* exception expansively. No Supreme Court decision except *Parden* itself, which was a five-four decision, has found consent under the *Parden* theory, and the requirement that Congress' intention to condition a state's participation in federally regulated activities on a forfeiture of sovereign immunity be clearly expressed has been strengthened so that already part of *Parden* stands overruled.

In *Employees of Dept. of Public Health & Welf. v. Missouri*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), the Supreme Court noted that the state hospitals being sued under the FLSA were non-profit organizations, compared to the railroad business which Alabama operated "for profit" in *Parden*. *Id.* 411 U.S. at 283, 93 S.Ct. at 1617. The Court put aside "[t]he dramatic circumstances of the *Parden* case" and found that Congress had not used such language in the FLSA as to clearly condition a state's operation of the hospital facilities at issue on the forfeiture of immunity from suit in a federal forum. *Id.* 411 U.S. at 285, 93 S.Ct. at 1618.

In *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Supreme Court further limited *Parden*. In *Edelman*, the Court found the Eleventh Amendment to be a bar to a suit against Illinois for the retroactive payment of AABD benefits wrongfully withheld. The Court rejected the argument that Illinois had constructively consented to the suit by participating in the federal Aid to the Aged, Blind and Disabled program and by agreeing to administer federal and state funds in compliance with federal law. *Id.* at 673, 94 S.Ct. at 1360. The Court noted that "constructive consent is not a doctrine commonly associated with the surrender of constitutional rights," and declared that:

> In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction."

*Id.* at 673, 94 S.Ct. at 1360–61 (citation omitted).

*Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), was a case which further tightened the statutory clarity required to find *Parden* style consent. There, the Court found that California had not consented to suit in federal court by accepting funds under the Rehabilitation Act because the language of the Act did not clearly condition the receipt of funds on a waiver of sovereign immunity. In so doing, the court recognized that "the mere receipt of federal funds cannot establish that a State has consented to suit in federal court." *Id.* 473 U.S. at 246–47, 105 S.Ct. at 3149.

Finally, in 1987, recognizing that *"Parden's* discussion of congressional intent to negate Eleventh Amendment immunity is no longer good law," the Supreme Court overruled anything in *Parden* inconsistent with the requirement of "unmistakeably clear language." *Welch v. Texas Dept. of Highways and Public Transp.,* 483 U.S. 468, 478, 107 S.Ct. 2941, 2948, 97 L.Ed.2d 389 (1987).

While there is no question that the IGRA clearly expresses Congress' intention to allow states to be sued by Indian tribes in federal court, the plaintiff's explanation of how Alabama has "consented" to this provision of the statute falls somewhat short. The Tribe claims that

> Alabama has participated in IGRA by engaging in negotiations to obtain jurisdiction over gaming activities on Indian lands and in so doing has waived any Eleventh Amendment immunity.... [T]he State has also unquestionably benefitted from its participation in IGRA because it provides an exception to the rule that states cannot sue tribes or enforce their laws on tribal lands.

[Plaintiff's Brief, Doc. # 15, p. 12].

The statutory provision allowing an Indian tribe to sue a state in federal district court, 25 U.S.C. § 2710(d)(7)(A)(i), is triggered by a state's failure to negotiate or to conduct such negotiations in good faith. In other words, the primary way for a state to subject itself to suit under the IGRA is to do *nothing.* This is a far cry from the "dramatic circumstances of the *Parden*

case," *Employees, supra,* where the state had entered the railroad business, like every other private company, for monetary profit. Here, Alabama has not engaged in any business, either for-profit or not-for-profit. Neither has Alabama received or administered any federal funds. Moreover, accepting as true the tribe's allegations that the state has negotiated with it to some extent, the fact of negotiations cannot change anything. If simply engaging in negotiations is enough to constitute consent, the state was faced with the Hobson's choice of negotiating and consenting to suit or refusing to negotiate and being sued for failure to negotiate. The act of negotiating itself seems even less an act of consent in light of the fact that the IGRA purports to compel states to negotiate, for it provides that "[u]pon receiving [a request to negotiate from an Indian tribe] the State *shall* negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A) (West Supp.1991) (emphasis supplied). Such a coercive construction of the statute as the Tribe urges would not be consent to suit but complete abrogation of Eleventh Amendment immunity under the guise of consent. The Court finds that Alabama has not consented to suit under the *Parden* doctrine.

**B.** *Abrogation*

Since 1976, Supreme Court decisions have allowed Congress to abrogate a state's Eleventh Amendment immunity in some circumstances, but the "cases require Congress' exercise of power to abrogate state sovereign immunity, *where it exists,* to be exercised with unmistakeable clarity." *Blatchford v. Native Village of Noatak,* —— U.S. ——, ——, 111 S.Ct. 2578, 2584, 115 L.Ed.2d 686 (1991) (emphasis supplied). While neither 28 U.S.C. § 1331 nor 28 U.S.C. § 1362 could abrogate a state's immunity, this Court has little doubt but that IGRA's attempted abrogation of state immunity is clear enough to do so if Congress has the power to abrogate in this situation. The applicable provision of the IGRA provides:

> The United States district courts shall have jurisdiction over any cause of action

initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal–State compact under paragraph (3) or to conduct such negotiations in good faith.

25 U.S.C. § 2710(d)(7)(A)(i) (West Supp. 1991). It is difficult to imagine a clearer statement of Congress' intent to subject states to lawsuits in the federal courts. However, whether Congress has the power to do this, no matter how clear it makes its intentions, is another question entirely. Because this Court believes that Congress does not have the power to abrogate a state's Eleventh Amendment immunity when enacting legislation pursuant to its power found in the Indian Commerce Clause, this Court finds that there could not constitutionally have been and therefore was not any abrogation of the states' Eleventh Amendment immunity in the enactment of the Indian Gaming Regulatory Act.

### 1. Pennsylvania v. Union Gas Co.

The plaintiff primarily relies on *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), a sharply divided Supreme Court decision, for the proposition that Congress had the authority to abrogate Alabama's Eleventh Amendment immunity when it enacted the IGRA. In the *Union Gas* plurality opinion, written by then Justice Brennan, four members of the Court concluded that Congress has the authority to override States' immunity when legislating pursuant to the Interstate Commerce Clause. *Union Gas*, 109 S.Ct. at 2284. In Part III of its opinion the plurality reasoned from language in *Parden* and *Employees* that "the power to regulate commerce includes the power to override States' immunity from suit ..." *Id.* 109 S.Ct. at 2281.

The deciding vote on the constitutional issue was cast by Justice White who, unfortunately, was somewhat less than clear about exactly what his concurrence meant.

Justice White spent over five pages of the Supreme Court Reporter explaining in partial dissent why he did not believe the statute at issue clearly expressed a Congressional intent to abrogate the state's immunity, a position joined by three other justices. Then, in part II of his concurrence, he devoted one short paragraph to the constitutional issue, saying only that "I agree with the conclusion reached by Justice Brennan in Part III of his opinion, that Congress has the authority under Article I to abrogate the Eleventh Amendment immunity of the States, although I do not agree with much of his reasoning." *Id.* at 2295.[2]

Justice Scalia cast the deciding vote on the statutory construction issue, agreeing with Brennan's plurality opinion that the Congressional language at issue was sufficiently clear to override a state's Eleventh Amendment immunity assuming the authority to do so. *Id.* However, joined by three other justices, he dissented as to Congress' authority to abrogate when legislating pursuant to the Commerce Clause, lamenting that "instead of cleaning up the muddled Eleventh Amendment jurisprudence produced by *Hans*, the Court leaves that in place, and adds to the clutter the astounding principle that Article III limitations can be overcome by simply exercising Article I powers." *Id.* 109 S.Ct. at 2303.

Because *Union Gas* is not directly on point, and with an eye toward the shaky ground on which it stands, this Court does not find the decision to be controlling. The weakness of the plurality opinion leads this Court to believe that it should not be given an expansive application and that, read narrowly, it does not require a determination that Congress had the power to abrogate Alabama's Eleventh Amendment immunity when it enacted the Indian Gaming Regulation Act.

To begin with, Justice White's mysterious, laconic concurrence on the abrogation issue makes the plurality opinion some-

---

**2.** For a similarly perplexed view of the import of Justice White's concurrence, see *Hart and Wechsler's The Federal Courts and The Federal System* (3d ed. 1988), 1989 Supp. at 94: "Doesn't a Justice who casts the deciding vote have some obligation to provide an explanation that is intelligible to the legal community?"

thing of a "four-and-a-half" vote majority. Moreover, two of the justices who joined the plurality opinion, Justice Marshall and Justice Brennan, are no longer members of the Supreme Court. While this fact does not in itself change the fact that the decision is presently on the books, Justice Scalia's four-vote dissent on the abrogation issue pointed out that the holding in *Union Gas* is "unstable" and the principle on which it rests "too much at war with itself to endure." 109 S.Ct. at 2273. Accordingly, this Court does not believe that the *Union Gas* decision should be given an expansive application until further guidance from the Supreme Court regarding exactly what the decision means and where it is leading.

With this understanding of *Union Gas,* it is clear that applying it to this case would be an unwarrantably expansive application. While *Union Gas* involved Congress' power to abrogate a state's Eleventh Amendment immunity when legislating pursuant to the Interstate Commerce Clause, the attempted abrogation at issue here was enacted pursuant to Congress' power under the Indian Commerce Clause. As the Supreme Court declared during the same term it decided *Union Gas,* "It is well established that the Interstate Commerce and Indian Commerce Clauses have very different applications." *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 192, 109 S.Ct. 1698, 1716, 104 L.Ed.2d 209 (1989). As the Court elaborated, "[t]he extensive case law that has developed under the Interstate Commerce Clause [ ] is premised on a structural understanding of the unique role of the states in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause." *Id.* This Court does not feel warranted in extending *Union Gas's* holding that Congress may abrogate a state's Eleventh Amendment immunity when legislating pursuant to the Interstate Commerce Clause to the Indian Commerce Clause. *See also Mississippi Band of Choctaw Indians v. State of Mississippi,* No. J90–

0386(B), slip op. at 13, 1991 WL 255614 (S.D.Miss. April 9, 1991) (concluding that *Union Gas* is not controlling authority for the determination of the Eleventh Amendment issues surrounding the IGRA). Accordingly, *Union Gas* does not require a determination that Congress had the power to abrogate Alabama's Eleventh Amendment immunity when it enacted the Indian Gaming Regulatory Act. Moreover, it is difficult for the Court to imagine how the Indian Commerce Clause, a provision of Article I of the Constitution, could restrict the operation of the Eleventh Amendment, since the Eleventh Amendment was adopted subsequent to and for the purpose of amending the original Constitution.

2. Peel v. Florida Dept. of Transp.

The plaintiff also relies on *Peel v. Florida Dept. of Transp.,* 600 F.2d 1070 (5th Cir.1979).[3] In *Peel,* the former Fifth Circuit allowed a Florida state employee to assert his federal reemployment rights against the state when his employment was terminated after he missed work on account of reserve military duty. The court reasoned that since the provision of the Veterans' Reemployment Rights Act which authorized suit against the state was within the legitimate scope of Congress' war power, the employee's suit to enforce rights granted by the Act was not barred by the Eleventh Amendment. After a careful survey of the nascent caselaw on Congressional abrogation of a state's Eleventh Amendment immunity, the panel summarily declared:

We are well aware that *Fitzpatrick [v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) ] and *Hutto [v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) ] involved the power of Congress under section 5 of the fourteenth amendment whereas the Act challenged here is founded on Congress's war power under article I. However, we are persuaded that nothing in the history of the eleventh amendment, the doctrine

---

**3.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

of sovereign immunity, or the case law indicates that Congress, when acting under an article I, section 8 delegated power, lacks authority to provide for federal court enforcement of private damage actions against the states.

*Peel,* 600 F.2d at 1080 (footnote omitted). Relying on this statement of its understanding of the law, the Court decided that Congress has the power to abrogate a state's Eleventh Amendment immunity when legislating pursuant to its war power. This Court can readily understand how the Fourteenth Amendment can limit the operation of the Eleventh Amendment, as the Fourteenth Amendment was adopted subsequent to the Eleventh Amendment, but fails to understand how the *Peel* court made the leap to the conclusion that an Article I power of Congress can limit the Eleventh Amendment when the Eleventh Amendment was adopted for the purpose of restricting the powers granted to the Federal Government under the original Constitution and not the other way around.

The plaintiff relies heavily on the quoted language from *Peel.* However, it must be acknowledged at the outset that anything in *Peel* beyond Congress' power to abrogate under the War Power Clause is mere dicta, for that case involved a statute enacted under Congress' war power. Moreover, it is readily apparent that the war power is different from Congress' power under the Indian Commerce Clause and that the special nature of the war power was important to the panel deciding *Peel.* The *Peel* court called the war power "one of the central powers given by the states to the federal government" and acknowledged that " '[t]he war power of the federal government is its supreme power. When it is in action it is transcendent.' " *Peel,* 600 F.2d at 1081 (quoting *St. Johns River Shipbuilding Co. v. Adams,* 164 F.2d 1012, 1015 (5th Cir.1947)).[4] The Indian Commerce Clause, while it does provide Congress with plenary power to legislate in the

field of Indian affairs, *Cotton Petroleum, supra,* 109 S.Ct. at 1716, is not "transcendent" in the sense that the War Power is.

Therefore, this Court does not consider *Peel* to be controlling on the issue of whether Congress may abrogate a state's Eleventh Amendment Immunity when legislating pursuant to the Indian Commerce Clause. Moreover, this Court questions whether *Peel* is still good law in light of later pronouncements from the United States Supreme Court. While the *Peel* court did an admirable job of grappling with the caselaw as it existed at the time, the panel would have to have been prophetic to discern the labyrinthine lines along which Eleventh Amendment jurisprudence would develop. For example, the *Peel* decision does not clearly distinguish between a consent or waiver theory and an abrogation theory. While this distinction may not have been apparent at the time *Peel* was decided, *Blatchford* makes clear that consent/waiver and abrogation are two separate and distinct lines of inquiry. As the Supreme Court stated, "[n]ot until 1976 ... did we first acknowledge a congressional power to abrogate state immunity—under § 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer,* 427 U.S. 445 [96 S.Ct. 2666, 49 L.Ed.2d 614] (1976)." *Blatchford, supra,* 111 S.Ct. at 2585. This confusion of the two doctrines led the *Peel* court to rely on *Parden* and *Employees* in finding that Congress has power to abrogate when legislating pursuant to its Commerce Clause power and to then extend this abrogation power to the War Power Clause. However, both those cases were decided before *Fitzpatrick,* the first abrogation case. Therefore, *Peel's* "extension" of the power to abrogate from the Commerce Clause to the War Power Clause rested on a faulty assumption. While the Supreme Court later found that language in *Parden* and *Employees* laid "a firm foundation" for its holding in *Union Gas* that Congress can abrogate state immunity pursuant to the

---

**4.** While it may seem disingenuous to contend that the Indian Commerce Clause is substantially different from the War Powers Clause, given that the *Peel* court saw itself as extending abrogation from the Commerce Clause to the War

Powers Clause (600 F.2d at 1081), later pronouncements from the Supreme Court demonstrate that the *Peel* court misapprehended the cases it relied upon. See below.

Interstate Commerce Clause, 109 S.Ct. at 2281, *Parden* and *Employees* did not so hold.

In *Parden, supra,* the Supreme Court held that the State of Alabama, which owned and operated a railroad in interstate commerce, could not successfully plead sovereign immunity in a federal-court suit brought against the railroad by one of its employees under the Federal Employers' Liability Act. *Parden,* 377 U.S. at 184, 84 S.Ct. at 1208, 1209. The theory was not abrogation but consent. In *Blatchford,* the Supreme Court explained *Parden* and emphatically rejected the notion that it was an abrogation case:

> *Parden* itself neither mentioned nor was premised upon abrogation. Its theory was that, by entering a field of economic activity that is federally regulated, the State impliedly "consent[s]" to be bound by that regulation and to be subject to suit in federal court on the same terms as other regulated parties, thus "waiv[ing]" its Eleventh Amendment immunity. 377 U.S., at 186, 84 S.Ct., at 1210.

*Blatchford,* 111 S.Ct. at 2585. The *Parden* Court itself indicated that abrogation, a doctrine not yet in existence, was not at issue:

> Recognition of the congressional power to render a State suable under the FELA does not mean that the immunity doctrine ... is here being overridden. It remains the law that a state may not be sued by an individual without its consent. Our conclusion is simply that Alabama, when it began operation of an interstate railroad approximately 20 years after enactment of the FELA, necessarily consented to such suit as was authorized by that Act.

*Parden,* 377 U.S. at 192, 84 S.Ct. at 1213; *see also Employees,* 411 U.S. at 282, 93 S.Ct. at 1617 ("The *Parden* case in final analysis turned on the question of waiver ...").

Likewise, *Employees, supra,* decided three years before the first abrogation case, rested on a consent theory and not on an abrogation theory. In *Employees,* the Court held that the statutory language of the Fair Labor Standards Act did not clearly indicate a purpose by Congress to make it possible for a State to be sued in federal court. Thus, assuming for the sake of argument that the Court did have an abrogation theory in mind, it did not reach the constitutional question of whether Congress has the power to abrogate a state's Eleventh Amendment immunity when legislating under the Commerce Clause because it concluded that Congress did not even attempt to do so. Moreover, from the Court's language, it is clear that it was employing a consent analysis. In discussing whether Congress intended to allow employees of state-run hospitals to sue their sovereign employers under the FLSA, the Court stated:

> It is not easy to infer that Congress in legislating pursuant to the Commerce Clause, which has grown to vast proportions in its applications, desired silently to deprive the States of an immunity they have long enjoyed under another part of the Constitution. Thus, we cannot conclude that Congress *conditioned the operation of these facilities* on the forfeiture of immunity from suit in a federal forum.

*Employees,* 411 U.S. at 285, 93 S.Ct. at 1618 (emphasis supplied). Thus, it is apparent from the Court's language that it had in mind the *Parden* consent theory, not abrogation.

Finally, it is striking to note that in the twelve years since it was decided, *Peel* has never once been cited as authority or even referred to by the United States Court of Appeals for the Eleventh Circuit. This silence as to *Peel,* while not an express disavowal, must nevertheless be seen as important given the fact that the Eleventh Circuit has several times addressed abrogation. In *Carr v. City of Florence, Ala.,* 916 F.2d 1521 (11th Cir.1990), *reh'g denied,* 925 F.2d 1477 (11th Cir.1991), for example, the Eleventh Circuit recently outlined the two major exceptions to a state's Eleventh Amendment immunity as follows:

> First, Congress can abrogate eleventh amendment immunity without the state's

consent when it acts pursuant to the enforcement provisions of section 5 of the fourteenth amendment. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985). Second, a state may waive its immunity expressly through legislative enactment.

916 F.2d at 1524. *See also Wu v. Thomas,* 863 F.2d 1543 (11th Cir.1989) (Tjoflat, C.J.), *reh'g denied,* 871 F.2d 122 (11th Cir.1989). While neither of these cases was addressing abrogation under the Article I powers of Congress, their failure even to acknowledge *Peel* in a context providing an opportunity to do so makes its vitality questionable.

3. The Plaintiff's "Plenary Power" Argument

■ The plaintiff also argues that, even without *Union Gas* or *Peel, Fitzpatrick* requires a holding that Congress has abrogation power when acting under the Indian Commerce Clause because that clause gives it plenary power. According to the plaintiff, *any* constitutional grant of plenary power to Congress carries with it the power to abrogate states' sovereign immunity.

The Court does not believe that the plaintiff's argument represents a proper understanding of *Fitzpatrick.* The plenitude of Congress' Fourteenth Amendment power was not the primary factor driving the Supreme Court's landmark decision in *Fitzpatrick* that Congress has the power to abrogate a state's Eleventh Amendment immunity when it is legislating pursuant to § 5 of the Fourteenth Amendment. As the Court stated,

When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority.

*Fitzpatrick,* 427 U.S. at 456, 96 S.Ct. at 2671. The Court also made clear that "the Eleventh Amendment, and the principle of

state sovereignty which it embodies, ... are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Id.* (citation omitted). Thus it was the impact of the Fourteenth Amendment upon the relationship between the federal government and the states and the recognition that it altered the provisions of the previously enacted Eleventh Amendment that drove the Court's decision in *Fitzpatrick,* not merely the fact that Congress' Fourteenth Amendment power is aptly described as "plenary." While Congress' power under both the Interstate and the Indian Commerce Clauses is also plenary, the Commerce Clause's own terms do not embody the same limitations on state authority found in the Fourteenth Amendment. Accordingly, under *Fitzpatrick,* only "in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment [may Congress] provide for private suits against States or state officials which are constitutionally impermissible in other contexts." *Id.* The Court must therefore reject the plaintiff's plenary power argument.

C. The *Ex Parte Young* Doctrine

■ The Supreme Court, in *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), explained the *Ex Parte Young* doctrine in some detail:

The Court has recognized an important exception to [the] general rule [of sovereign immunity]: **a suit challenging the constitutionality of a state official's action is not one against the state.** This was the holding in *Ex Parte Young,* [209 U.S. 123], 28 S.Ct. 441 [52 L.Ed. 714] (1908), in which a federal court enjoined the Attorney General of the State of Minnesota from bringing suit to enforce a state statute that allegedly violated the Fourteenth Amendment. This Court held that the Eleventh Amendment did not prohibit issuance of this injunction. The theory of the case was that an unconstitutional enactment is "void" and therefore does not "impart to [the officer] any immunity from responsibility to

the supreme authority of the United States." 28 S.Ct. at 454. Since the State could not authorize the action, the officer was "stripped of his official or representative character and [was] subjected in his person to the consequences of his individual conduct." *Id.*

While the rule permitting suits alleging conduct contrary to "the supreme authority of the United States" has survived, the theory of *Young* has not been provided an expansive interpretation. Thus, in *Edelman v. Jordan,* 94 S.Ct. 1347 (1974), the Court emphasized that the Eleventh Amendment bars some forms of injunctive relief against state officials for violation of federal law.... In particular, *Edelman* held that **when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief.** Under the theory of *Young,* such a suit would not be one against the State since the federal-law allegation would strip the state officer of his official authority. Nevertheless, retroactive relief was barred by the Eleventh Amendment.

*Id.* 465 U.S. at 102–03, 104 S.Ct. at 909 (citations omitted, boldface added).

While the *Ex Parte Young* doctrine perhaps allows this suit against the Governor, who has not filed a motion to dismiss, the doctrine clearly does nothing to allow the suit against the State of Alabama, for its only application is in official-capacity suits against state officials. *See Pennhurst, supra,* 465 U.S. at 100, 104 S.Ct. at 908 ("It is clear, of course, that in the absence of consent a suit in which the state or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *Kentucky v. Graham,* 473 U.S. 159, 167 n. 2, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985) ("A State cannot be sued directly in its own name regardless of the relief sought").

Because none of the three exceptions to the Eleventh Amendment bar apply to this case, the defendant State of Alabama is entitled to be dismissed from this action.

## IV. THE GOVERNOR'S MOTION TO STRIKE

The Governor, while not joining the State's Motion to Dismiss, has filed a Motion to Strike [Doc. # 4], asserting that:

Any and all allegations contained in the complaint which concern the good or bad faith of either the State of Alabama, Governor Hunt or the plaintiff in conducting negotiations under the Act are irrelevant and immaterial to the issue set forth above and should be stricken from the complaint; Governor Hunt hereby moves that the Court strike such allegations.

[Governor's Answer, Doc. # 4, p. 2]. The issue referred to was the subject of the original complaint regarding which forms of Class III gaming must be authorized. In light of the Court's decision, hereinafter set forth, to allow the plaintiff to amend its complaint to more closely track the provisions of the IGRA, the Court is of the opinion that the good or bad faith of the parties may become relevant and material and that the Governor's Motion to Strike is due to be DENIED.

## V. THE TRIBE'S MOTION TO AMEND COMPLAINT

■ The plaintiff filed a "Motion to Amend Complaint" [Doc. # 12], seeking permission from the Court to alter the relief requested in the original complaint. The Federal Rules of Civil Procedure governing the amendment of pleadings state:

A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Fed.R.Civ.P. 15(a). Because the defendants have already answered and have not consented in writing to the amendment, the plaintiff requires the Court's leave to amend. The determination of whether to

**564**

grant leave to amend the complaint after responsive pleadings have been filed is within the sound discretion of this Court. *Shipner v. Eastern Air Lines, Inc.,* 868 F.2d 401, 406 (11th Cir.1989). The rules of civil procedure restrict this discretion, however, by directing that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Shipner,* 868 F.2d at 407. Thus, in the absence of any apparent reason not to do so, the Court should grant leave to amend. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Shipner,* 868 F.2d at 407.

There being no response from the Governor and no apparent reason not to grant leave to amend, it is hereby ORDERED that the plaintiff's Motion to Amend Complaint [Doc. # 12] is GRANTED.

## VI.   CONCLUSION

For the foregoing reasons, the defendant State of Alabama's Motion to Dismiss [Doc. # 6] is GRANTED, the defendant Guy Hunt's Motion to Strike [Doc. # 4] is DENIED, and the plaintiff's Motion to Amend Complaint [Doc. # 12] is GRANTED.