The KICKAPOO TRIBE OF INDIANS, of the Kickapoo Reservation in Kansas, a/k/a Kickapoo Nation in Kansas, et al., Plaintiffs,

v.

STATE OF KANSAS, Defendant.

PRAIRIE BAND OF POTAWATOMI INDIANS, a federally recognized tribe, Plaintiff,

v.

STATE OF KANSAS, Defendant.

Nos. 92–4233–SAC, 92–4234–SAC.

United States District Court,
D. Kansas.

March 29, 1993.

C. Bruce Works, Works, Works & Works, P.A., Topeka, KS, Robert L. Pirtle, Pirtle, Morisset, Schlosser & Ayer, Seattle, WA, for Potawatomi Indians, Prairie Band of, a federally recognized tribe, plaintiff.

Lance W. Burr, Lawrence, KS, Glenn M. Feldman, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A., Phoenix, AZ, for The Kickapoo Tribe of Indians, of the Kickapoo Reservation in Kansas and Steve Cadue, Tribal Chairman of the Kickapoo Nation in Kansas, plaintiffs.

John W. Campbell, Office of the Attorney General, Topeka, KS, for State of Kansas, defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

These consolidated cases come before the court on the defendant's motion pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss for lack of jurisdiction. The State of Kansas argues the Eleventh Amendment precludes this court from exercising jurisdiction. The plaintiffs oppose the motion on several different grounds. The parties request oral argument on the motion. The court denies the request as oral argument would not materially assist the court in deciding the motion.

The plaintiffs bring their suits under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.* In the wake of *California v. Cabazon Band of Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), Congress enacted IGRA. The Supreme Court in *Cabazon* held that California in regulating tribal bingo games impermissibly interfered with tribal government. 480 U.S. at 222, 107 S.Ct. at 1095. California's interest in preventing organized crime's involvement was outweighed by the tribal interests in self-sufficiency and economic development. 480 U.S. at 219–22, 107 S.Ct. at 1093–95. With tribes rushing to start or expand their gaming enterprises and the federal and state governments alarmed over the potential ills if gaming on Indian reservations went unregulated, Congress stepped in and passed IGRA as a compromise of the competing interests.[1]

IGRA is to serve as the statutory basis for the operation and regulation of gaming by Indian tribes. 25 U.S.C. § 2702. IGRA separates gaming activities into three classes

---

1. Congress found that tribes were using gaming activities to generate revenue but that federal law did not offer "clear standards or regulations for the conduct of gaming on Indian lands." 25 U.S.C. § 2701(1), (3). Congress also recognized that Federal Indian policy is intended to encourage economic development and self-sufficiency for the tribes. 25 U.S.C. § 2701(4). Finally, Congress basically interpreted *Cabazon* as giving the tribes "the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5).

and specifies a different degree of governmental intervention in the regulation of each class. Class I gaming includes social games played for minimal prizes or as part of tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). It is within the tribes' exclusive jurisdiction and is not subject to IGRA or to state or federal regulation. 25 U.S.C. § 2710(a)(1). Class II gaming covers bingo, pull tabs, lotto, punch boards and certain non-banking card games. Though not subject to state regulation, class II gaming may be conducted only "within a State that permits such gaming for any purpose by any person, organization or entity." 25 U.S.C. § 2710(b)(1)(A). The regulation of class II gaming remains with the tribes with some oversight by the National Indian Gaming Commission ("NIGC"). All other gaming activities come within class III gaming and are legal only if authorized by tribal resolution, approved by the chairman of the NIGC, "located in a state that permits such gaming for any purpose by any person, organization or entity," and "conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1).

A tribe seeking to conduct or continue class III gaming must request negotiations with the state where the tribal land is located. The state must then "negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(3)(A). When a tribe, like the plaintiffs here, thinks the state has not entered into negotiations or has not conducted such negotiations in good faith, the tribe may sue the state. 25 U.S.C. § 2710(7).

IGRA vests federal district courts with jurisdiction over these suits:

The United States district courts shall have jurisdiction over—

(i) any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal–State compact under paragraph (3) or to conduct such negotiations in good faith,

(ii) any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal–

State compact entered into under paragraph (3) that is in effect, and

(iii) any cause of action initiated by the Secretary to enforce the procedures prescribed under subparagraph (B)(vii).

Facing this explicit and plain grant of federal court jurisdiction over it, the State of Kansas moves to dismiss the plaintiffs' suits arguing the Eleventh Amendment bars this court from exercising such jurisdiction.

The Eleventh Amendment states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. As construed by the Supreme Court, this amendment embodies more than what its literal text conveys. Long ago, in *Hans v. Louisiana,* 134 U.S. 1, 10, 10 S.Ct. 504, 505, 33 L.Ed. 842 (1890), the Court held that the Eleventh Amendment precludes citizens from bringing suits in federal court against their own states. Though the exact words of the Eleventh Amendment only refer to suits brought by citizens of another state, this judicial gloss has stood the test of time because of its constitutional underpinning:

Despite the narrowness of its terms, since *Hans v. Louisiana,* 134 U.S. 1, 33 L.Ed. 8421 [842], 10 S.Ct. 504 (1890), we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact; that the judicial authority in Article III is limited by this sovereignty.... (citations omitted).

*Blatchford v. Native Village of Noatak,* — U.S. ——, ——, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686, 694 (1991); *see Welch v. Dept. of Highways & Public Transp.,* 483 U.S. 468, 472, 107 S.Ct. 2941, 2945, 97 L.Ed.2d 389 (1987) (plurality opinion). In other words, the Eleventh Amendment affirms " 'that the fundamental principle of sovereign immunity limits the grant of judicial authority under Art. III' of the Constitution." *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238,

105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985) (quoting *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984)). The current interpretation of the Eleventh Amendment even bars Indian tribes from bringing suit against a state in federal court. *Blatchford*, —— U.S. at ——-——, 111 S.Ct. at 2581–82, 115 L.Ed.2d at 694–96.[2]

■ Though often couched in terms of sovereign immunity, the Eleventh Amendment functions as a jurisdictional bar. *See Welch*, 483 U.S. at 476 n. 6, 107 S.Ct. at 2947 n. 6 (the "Eleventh Amendment immunity 'partakes of the nature of a jurisdictional bar,' ") (quoting *Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974)); *Ambus v. Granite Bd. of Educ.*, 975 F.2d 1555, 1559 (10th Cir.1992), *reh'g granted*, (Nov. 12, 1992). "The Eleventh Amendment bar to suit is not absolute." *Port Auth. Trans–Hudson v. Feeney*, 495 U.S. 299, 304, 110 S.Ct. 1868, 1872, 109 L.Ed.2d 264 (1990). There are two recognized ways for a federal court to gain jurisdiction over a state: consent or waiver of immunity by the state and abrogation of immunity by Congress. *Fee-*

*ney*, 495 U.S. at 272, 110 S.Ct. at 305. On the qualitative weight of existing precedent, the court finds the second exception controlling here.

■ Because the typical constitutional balance between the states and the federal government is upset when the states lose their Eleventh Amendment immunity, the courts must be certain that Congress intended this. *Feeney*, 495 U.S. at 305, 110 S.Ct. at 1872.[3] To ensure this certainty, Congress' intention must be "unequivocally expressed" or "unmistakably clear" in the statutory language. *Atascadero State Hospital v. Scanlon*, 473 U.S. at 242–43, 105 S.Ct. at 3147. "[E]vidence of congressional intent must be both unequivocal and textual." *Dellmuth v. Muth*, 491 U.S. 223, 230, 109 S.Ct. 2397, 2401, 105 L.Ed.2d 181 (1989). The statutory language must offer more than a permissible inference that Congress intended to abrogate the states' immunity; it must unequivocally declare this intent. *Id.* Nor is it enough that the federal statute generally authorizes suit in federal court. *Atascadero State Hospital v. Scanlon*, 473 U.S. at 246, 105 S.Ct. at 3149.

---

2. The tribes in *Blatchford* first argued that sovereign immunity under the Eleventh Amendment limits suits by individuals against sovereigns as opposed to suits by sovereigns against sovereigns. Relying on *Monaco v. Mississippi*, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934), the Court held that a state's sovereign immunity extended to individuals and sovereigns alike and that a state's surrender of immunity must be discerned from the plan of the convention. —— U.S. at ——, 111 S.Ct. at 2581, 115 L.Ed.2d at 695. The Court found nothing to suggest that this surrender of immunity was inherent in the convention. *Id.* Unlike the surrender of immunity between sister states to the convention, the tribes were not parties to the convention and did not surrender their immunity to the states. Consequently, the Court found it incongruous that the states would surrender their immunity without a mutual concession from the Indian tribes. At ——, 111 S.Ct. at 2581, 115 L.Ed.2d at 696. The Supreme Court next rejected the notion that 28 U.S.C. § 1362, which grants jurisdiction to federal district courts over civil actions brought by any Indian tribe regarding a controversy arising under the Constitution or federal law or treaty, put the Indian tribes on the same footing as the United States in suing the states in federal court. At ——, 111 S.Ct. at 2582, 115 L.Ed.2d at 697–98. Finally, the Supreme Court held that § 1362 did not abrogate the states' immunity under the Eleventh Amendment. In the majori-

ty's opinion, the terms of § 1362 do not reflect an unmistakably clear intent on Congress' part to abrogate the states' defense of immunity from suit in federal court. At ——, 111 S.Ct. at 2583, 115 L.Ed.2d at 699. *Blatchford* is relevant here for its holdings that Congress in enacting § 1362 did not abrogate the states' Eleventh Amendment immunity and that the states in entering into the plan of convention did not waive implicitly their immunity from federal suit by the Indian tribes. *Blatchford* is relevant for another reason too. The Ninth Circuit had held that Congress enacted § 1362 in the exercise of its authority under the Indian Commerce Clause ceded to it by the states. *Native Village of Noatak v. Hoffman*, 896 F.2d 1157, 1164 (9th Cir.1990). Instead of deciding whether Congress even had the authority to abrogate immunity pursuant to the Indian Commerce Clause, the Court assumed this without saying so and then found that the terms of § 1362 did not show the exercise of such authority. To this extent, *Blatchford* is significant for what it does not say.

3. Out of the same respect for our system of dual sovereignty and the fundamental constitutional balance between the states and the federal government, the Supreme Court imposes the same plain statement rule in the Tenth Amendment context. *See Gregory v. Ashcroft*, —— U.S. ——, ——-——, 111 S.Ct. 2395, 2400–01, 115 L.Ed.2d 410, 423–24 (1991).

■ The proper place to begin in deciding the issue of congressional abrogation is the statutory language. *Dellmuth v. Muth,* 491 U.S. at 231, 109 S.Ct. at 2402. The State of Kansas contends IGRA lacks a plain statement to abrogate Eleventh Amendment immunity. Specifically, IGRA does not refer to the Eleventh Amendment or sovereign immunity and does not preclude a state from asserting these defenses or similar ones. The State of Kansas largely relies on this corollary found in *Blatchford:* "The fact that Congress grants *jurisdiction* to hear a claim does not suffice to show Congress has abrogated all *defenses* to that claim." —— U.S. at —— n. 4, 111 S.Ct. at 2585 n. 4, 115 L.Ed.2d at 686 n. 4 (emphasis in original).

■ In unambiguous terms, IGRA provides that federal district courts "shall have jurisdiction over any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe." 25 U.S.C. § 2710(d)(7)(A)(i). Unlike a statute generally granting jurisdiction over suits brought by an Indian tribe, this provision gives the tribes a federal forum specifically for enforcing their rights under IGRA. The tribe's suit and the federal court's jurisdiction are triggered under this provision by the particular state's failure to negotiate in good faith. The state is the only possible defendant to such a suit, and it is the only other party to the compact negotiations. Congress fully contemplated and expressed its desire to give the tribes a federal forum by which they could compel the states to negotiate fairly with them. This is not just a permissible inference; it is the only reasonable inference. Without such an enforcement mechanism, IGRA could not serve its purposes, because the states would be free to ignore or frustrate negotiations over class III gaming leaving the tribes without any right or recourse. Short of mentioning the Eleventh Amendment or sovereign immunity, a clearer statement of the intent to abrogate is difficult to envision. The courts have found that Congress unequivocally expressed its intent in IGRA to abrogate the states' immunity. *Seminole Tribe of Florida v. State of Fla.,* 801 F.Supp. 655, 658 (S.D.Fla.1992); *Sault Ste. Marie Tribe of Chippewa Indians v. State,* 800 F.Supp. 1484, 1488–89 (W.D.Mich.1992); *Poarch*

*Band of Creek Indians v. State of Ala.,* 776 F.Supp. 550, 557–58 (S.D.Ala.1991); *Ponca Tribe of Oklahoma v. State of Oklahoma,* No. 92–988–T, slip op. at 6 (W.D.Okla. Sep. 8, 1992); *Pueblo of Sandia v. State of New Mexico,* No. 92–0613–JC, slip op. at 2 (D.N.M. Nov. 13, 1992). Against the "cascade of plain language," *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 11, 109 S.Ct. 2273, 2279, 105 L.Ed.2d 1 (1989), the defendant's arguments to the contrary are untenable.

■ The issue over which the courts are divided is whether Congress may abrogate the state's immunity in the exercise of its power under the Commerce Clause. Supreme Court precedent establishes that Congress may abrogate Eleventh Amendment immunity in the exercise of its enforcement authority under § 5 of the Fourteenth Amendment, *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976), or its powers under the Commerce Clause. *Pennsylvania v. Union Gas Co.,* 491 U.S. at 14–15, 109 S.Ct. at 2281–82 (plurality opinion); *id.* at 57, 109 S.Ct. at 2303 (White, J. concurring in the judgment). In both instances, the Supreme Court found that Congress had abrogated immunity in the enactment of a new federal statutory cause of action. *Fitzpatrick,* 427 U.S. at 456, 96 S.Ct. at 2671 (abrogated states' immunity from money damage awards under Title VII of the Civil Rights Act of 1964); *Union Gas,* 491 U.S. at 23, 109 S.Ct. at 2286 (abrogated states' immunity from money damages under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA")).

Despite this precedent, a majority of the district courts have held that Congress in enacting IGRA lacked the authority to abrogate the states' Eleventh Amendment immunity. *Sault Ste. Marie Tribe of Chippewa Indians v. State,* 800 F.Supp. at 1489–90; *Spokane Tribe of Indians v. State of Wash.,* 790 F.Supp. 1057, 1060–61 (E.D.Wash.1991); *Poarch Band of Creek Indians v. State of Ala.,* 776 F.Supp. at 559–62; *Ponca Tribe of Oklahoma v. State of Oklahoma,* slip op. at 6–8; *Pueblo of Sandia v. State of New Mexico,* slip op. at 3; *but see Seminole Tribe of Florida v. State of Fla.,* 801 F.Supp. at 658–

63. Calling *Union Gas* a weak plurality opinion, the majority read it narrowly, *see Poarch Band,* 776 F.Supp. at 558–59; *Sault Ste. Marie,* 800 F.Supp. at 1489; *Ponca Tribe,* slip op. at 7, and perceive a distinction of purported relevance between the Interstate Commerce Clause and the Indian Commerce Clause, *see Poarch Band,* 776 F.Supp. at 559; *Spokane Tribe,* 790 F.Supp. at 1060–61; *Ponca Tribe,* slip op. at 7; *Pueblo of Sandia,* slip op. at 2–3. Too quick to say the last rites over *Union Gas* and too eager to rely on a distinction without a difference, the majority offer an approach unpersuasive to this court.

Beginning with the irrefutable, a majority of the Supreme Court held in *Union Gas* that Congress has the power to override the states' Eleventh Amendment immunity in the exercise of its Commerce Clause power. Neither that decision nor its premise has been overturned by another majority of the Court, even though the opportunity has presented itself.[4] When judged alongside other Supreme Court decisions holding that despite their sovereignty states may be subject to liability under federal statutes enacted under the Commerce Clause, *see, e.g., Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 555–56, 105 S.Ct. 1005, 1019–20, 83 L.Ed.2d 1016 (1985) (Provisions of the Fair Labor Standards Act ("FLSA") did not violate any limits on Congress' authority under the Commerce Clause); *E.E.O.C. v. Wyoming,* 460 U.S. 226, 243, 103 S.Ct. 1054, 1064, 75 L.Ed.2d 18 (1983) (Extension of Age Discrimination in Employment Act of 1967 ("ADEA") to cover state and local governments was a proper exercise of Commerce Clause powers), *Union Gas* is not a weak opinion without a firm foundation.

Lower courts, including the instant court, continue to cite *Union Gas* as binding precedent. *See, e.g., Tenn. Dept. of Human Serv. v. U.S. Dept. of Educ.,* 979 F.2d 1162, 1166 (6th Cir.1992); *Hale v. State of Ariz.,* 967 F.2d 1356, 1361 (9th Cir.1992); *State of N.Y. v. U.S.,* 942 F.2d 114, 121 (2nd Cir.1991), *aff'd in part and rev'd in part on other grounds,* —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Reopell v. Com. of Mass.,* 936 F.2d 12, 15–16 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 637, 116 L.Ed.2d 655 (1991); *Brinkman v. Dept. of Corr. of State of Kan.,* 804 F.Supp. 163, 165 (D.Kan.1992). Speculation over what the currently constituted Court may do in a given case may be academically satisfying, but it does not impel this court to ignore viable precedent.

Resort to an expansive reading of *Union Gas* is unnecessary, for just a fair reading demonstrates it is controlling here. In discussing whether the Commerce Clause gives Congress the power to enact statutes under which states may be held liable for money damages in federal court, Justice Brennan's plurality opinion first marked the path the Court had taken in prior decisions. He found a "firm foundation" for the conclusion "that Congress' authority to regulate commerce includes the authority directly to abrogate States' immunity from suit." 491 U.S. at 14, 109 S.Ct. at 2281. Justice Brennan next found the rationale in *Fitzpatrick* equally applicable to Congress' exercise of plenary powers under the Commerce Clause:

> Like the Fourteenth Amendment, the Commerce Clause with one hand gives power to Congress while, with the other, it takes power away from the States. It

4. Apparently, it has been difficult for a majority of the Court to reach a consensus on Congress' authority to override the states' sovereign immunity in legislating pursuant to the Commerce Clause. Prior to *Union Gas,* the Court assumed without deciding on two occasions that the Commerce Clause empowered Congress with that authority. *See, e.g., Welch v. Texas Dept. of Highways and Public Transp.,* 483 U.S. 468, 475, 107 S.Ct. 2941, 2947, 97 L.Ed.2d 389 (1987) (plurality opinion); *County of Oneida v. Oneida Indian Nation of New York,* 470 U.S. 226, 252, 105 S.Ct. 1245, 1261, 84 L.Ed.2d 169 (1985) (citing the Indian Commerce Clause). Since *Union Gas,* the Court has had the chance to overrule the basic premise that Congress' plenary powers under the Commerce Clause necessarily include the authority to extinguish a state's sovereign immunity. *See, e.g., Gregory v. Ashcroft,* —— U.S. ——, —— – ——, 111 S.Ct. 2395, 2403, 115 L.Ed.2d 410, 425–26 (1991) ("We are constrained in our ability to consider the limits that the state-federal balance places on Congress' powers under the Commerce Clause. *See Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528 [105 S.Ct. 1005, 83 L.Ed.2d 1016] (1985)."); *Blatchford v. Native Village of Noatak,* —— U.S. at —— – ——, 111 S.Ct. at 2584–86, 115 L.Ed.2d at 698–700 (see footnote two above).

cannot be relevant that the Fourteenth Amendment accomplishes this exchange in two steps (§§ 1–4, plus § 5), while the Commerce Clause does it in one. The important point, rather, is that the provision both expands federal power and contracts state power; that is the meaning, in fact, of a "plenary" grant of authority, and the lower courts have rightly concluded that it makes no sense to conceive of § 5 as somehow being an "ultraplenary" grant of authority.

491 U.S. at 16–17, 109 S.Ct. at 2282 (citations omitted). Justice Brennan then rejected Justice Scalia's attempt to distinguish *Fitzpatrick* as involving a subsequent limitation (Fourteenth Amendment) on the state's immunity under the Eleventh Amendment. Assuming chronology was relevant to the constitutional analysis, Justice Brennan rightly observed that the principle of sovereign immunity, which the Eleventh Amendment is said to affirm, existed well before the states even ratified the Constitution. 491 U.S. at 17–18, 109 S.Ct. at 2282–83.

After disputing two other less significant points raised by Justice Scalia, Justice Brennan concluded:

> Our prior cases thus indicate that Congress has the authority to override States' immunity when legislating pursuant to the Commerce Clause. This conclusion is confirmed by a consideration of the special nature of the power conferred by that Clause.

491 U.S. at 19, 109 S.Ct. at 2284. At this point, Justice Brennan bolstered the majority's conclusion by exploring the "special nature" of Congress' plenary power under the Commerce Clause. *Id.* He made several observations. The Commerce Clause confers certain powers on Congress and necessarily takes away those powers from the states. Congress' ability to exercise those powers would be hampered if it could not make the states liable for damages. Consequently, in ratifying the Constitution, the states gave their authority to regulate commerce to Congress and consented to the surrender of their immunity from those suits deemed necessary by Congress in the exercise of its Commerce Clause powers. 491 U.S. at 19–20, 109 S.Ct. at 2283–84.

In making these latter comments, Justice Brennan did not invoke the principles surrounding a state's implied waiver of immunity in the plan of convention. In fact, Justice Brennan in a closing footnote expressly denied even having discussed a theory of implied waiver.[5] 491 U.S. at 23 n. 5, 109 S.Ct. at 2286 n. 5. The plurality opinion in *Union Gas*, in this court's judgment, should not be attacked for relying on an implied waiver theory, when the comments were only meant to emphasize "the special nature" and "breadth and depth of the commerce power." 491 U.S. at 19, 20, 109 S.Ct. at 2284, 2285.

To read *Union Gas* as only applying to the Interstate Commerce Clause works a disservice to the broad reasoning in that opinion, defies the plain language of the Constitution, and overlooks a long line of precedent on Congress' plenary power over Indian commerce. The Commerce Clause gives Congress the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. 1, § 8, cl. 3. Nothing in these words suggests Congress' power to regulate interstate commerce is any less than its power to regulate Indian commerce. *See Seminole Tribe of Florida v. State of Fla.*, 801

---

5. The defendant argues that Justice Brennan's plurality opinion is a "flawed equation," because it relies in part on a theory of "surrender of immunity in the plan of the convention." The defendant argues this theory was rejected by the Court in *Blatchford*. The defendant's arguments do not show *Union Gas* to be a flawed equation. The Court in *Blatchford* held that the states did not waive their immunity against Indian tribes in adopting the Constitution. —— U.S. at ——, 111 S.Ct. at 2582, 115 L.Ed.2d at 695. In contrast, the plurality opinion in *Union Gas* expressly disavowed any reliance on a theory of implied waiver and referred to the states' ratification of the Constitution only to strengthen its conclusion

that Congress' Commerce Clause powers are plenary in nature. 491 U.S. at 23 n. 5, 109 S.Ct. at 2286 n. 5. The Court in *Blatchford* was unwilling to imply a waiver between a state and tribe, as it had between sister states, because there was no mutual concession. —— U.S. at ———— ——, 111 S.Ct. at 2582–83, 115 L.Ed.2d at 695–96. In contrast, the plurality opinion in *Union Gas* focused on the states' surrender of authority to Congress to regulate commerce and the states' accompanying relinquishment of immunity from suit upon Congress' exercise of that authority. 491 U.S. at 19–20, 109 S.Ct. at 2283–84. This reasoning from *Union Gas* is not rejected by *Blatchford*, for it is never addressed there.

F.Supp. at 662 n. 8. This is not to say that Congress exercises these separate powers with the same concerns in mind.

The Supreme Court referred to this distinction in *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 192, 109 S.Ct. 1698, 1716, 104 L.Ed.2d 209 (1989) [6]:

> It is also well established that the Interstate Commerce and Indian Commerce Clauses have very different applications. In particular, while the Interstate Commerce Clause is concerned with maintaining free trade among the States even in the absence of implementing federal legislation, (citations omitted), the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs, (citations omitted). The extensive case law that has developed under the Interstate Commerce Clause, moreover, is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause. Most notably, as our discussion of Cotton's "multiple taxation" argument demonstrates, the fact that States and

tribes have concurrent jurisdiction over the same territory makes it inappropriate to apply Commerce Clause doctrine developed in the context of commerce "among" States with mutually exclusive territorial jurisdiction to trade "with" Indian tribes. When put in its proper context, this distinction is without significance here. The distinction draws on the most obvious, that is, tribes are not states and Congress' concerns in regulating commerce among the states are different from those in regulating commerce with the Indian tribes. This distinction does not suggest that Congress' powers under the Interstate Commerce Clause are "ultraplenary" or somehow more extensive over the states than those under the Indian Commerce Clause. If anything, the Court in *Cotton Petroleum* suggests just the opposite. Pursuant to the Indian Commerce Clause, the "federal sovereign [Congress] has the undoubted power to prohibit taxation" by the state or the tribe or both. 490 U.S. at 189, 109 S.Ct. at 1714. But if the Interstate Commerce Clause is used, the federal sovereign may only require the States to apportion their taxes. 490 U.S. at 188, 109 S.Ct. at 1713.[7] *Cotton Petroleum* is not a cogent reason for reading *Union Gas* narrowly.

---

**6.** Cotton Petroleum ("Cotton"), a non-Indian company, leased certain on-reservation land having oil and gas wells. On the minerals produced, Cotton paid severance taxes not only to the tribe but to the State of New Mexico. Cotton argued the state and tribal taxes constituted an unlawful multiple tax burden on interstate commerce. 490 U.S. at 187–88, 109 S.Ct. at 1713–14. Under the Interstate Commerce Clause, when more than one state attempts to tax the same activity from which a business receives income from several states, an apportionment formula is used so that a state taxes only the activities conducted within its borders. 490 U.S. at 188, 109 S.Ct. at 1713. The Court offered several reasons for not borrowing this rule. Each of the governmental entities had taxing jurisdiction over all of the leases. *490 U.S. at 188, 109 S.Ct. at 1713.* Congress has the "undoubted power to prohibit taxation of the Tribe's lessees by the Tribe, by the State, or by both, but ... it has not exercised that power." 490 U.S. at 189. Finally, Indian tribes are not states within the meaning of the interstate commerce clause and should not be treated like states under that clause. It is here then that *the Supreme Court offered the above distinction* between the two commerce clauses.

**7.** This point is more fully developed in this quotation taken from Ainsworth, <u>The Negative Foreign Commerce Clause: An Analysis of the Reserved</u>

<u>Unitary Tax Issue in Container Corporation of</u> <u>America v. California Franchise Tax Board,</u> 8 B.U.J.Tax L. 65 (1990) which the court in *Seminole Tribe of Florida v. State of Fla.,* 801 F.Supp. at 662 n. 8, also quoted:

> First, Indian Commerce Clause analysis is structured differently than Interstate Commerce Clause analysis. It proposes a tripartite balancing of unequal interests (tribal, state, and federal) rather than a binary balancing of constitutionally equal interests (two similarly situated taxpayers in the same or different states). Second, under the Indian Commerce Clause, there is a presumption against state authority to tax Indian-value without express Congressional approval; whereas under the Interstate Commerce Clause, there is a presumption in favor of any non-discriminatory state taxing scheme which has not been expressly disapproved of by Congress. Finally, under the Indian Commerce Clause, it is the quantitative weight of the burden imposed on Indian commerce that is the significant question; whereas under the Interstate Commerce Clause, it is the equal distribution of tax burdens among taxpayers, regardless of the absolute amount of the overall burden, that matters.

In sum, the differences between the clauses are not due to Congress having less powers—*vis-a-vis* the states—under the Indian Commerce Clause.

The breadth and depth of Congress' powers under the Indian Commerce Clause are equal to, if not greater than, its powers under the Interstate Commerce Clause. The Indian Commerce Clause provides Congress with plenary power "to deal with special problems of Indians" and "to single Indians out as a proper subject for separate legislation." *Morton v. Mancari*, 417 U.S. 535, 551–52, 94 S.Ct. 2474, 2475–76, 41 L.Ed.2d 290 (1974); *see Delaware Tribal Business Comm. v. Weeks*, 430 U.S. 73, 84, 97 S.Ct. 911, 919, 51 L.Ed.2d 173 (1977) (Congress' power over Indian affairs is plenary in nature.)[8] It is beyond serious dispute that the federal government's power over Indian affairs displaces the powers normally exercised by the states within their own borders. "With the adoption of the Constitution, Indian relations became the *exclusive* province of federal law." *Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985). "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." *Rice v. Olson*, 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945) (quoted in *McClanahan v. Arizona Tax Comm.*, 411 U.S. 164, 168, 93 S.Ct. 1257, 1260, 36 L.Ed.2d 129 (1973)). In yet another case, the Court saw Congress' broad power over Indian affairs as a barrier to the states' exercise of authority over commercial activity on Indian reservations. *Ramah Navajo School Bd. v. Bureau of Revenue*, 458 U.S. 832, 837, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174 (1982).[9] The Indian Commerce Clause bestows Congress with exclusive plenary powers over Indian affairs and deprives in like degree the states' authority to regulate these activities within its borders.

What is left is the simple matter of applying what the Court said in *Union Gas* and *Fitzpatrick*. Justice Brennan relied on the "straight-forward" rationale offered in *Fitzpatrick*: " 'When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority.' " *Union Gas*, 491 U.S. at 16, 109 S.Ct. at 2282 (quoting *Fitzpatrick*, 427 U.S. at 456, 96 S.Ct. at 2671). There are two aspects to this rationale. First, inherent in Congress' exercise of a constitutional grant of plenary authority is the authority to override states' immunity.[10] Unquestionably, Congress' authority over Indians is plenary in nature. Second, besides granting authority to Congress, the constitutional provision must limit the state's authority. This is not a problem here either, for the Indian Commerce Clause gave Congress authority over Indian affairs to the exclusion of the states' sovereignty over matters within their own borders. Just like the Interstate Commerce Clause, the Indian Commerce Clause "both expands federal power and contracts state power; that is the meaning, in fact, of a 'plenary' grant of authority." *Union Gas*, 491 U.S. at 17, 109 S.Ct. at 2282. As the case law cited in the prior paragraph evidences, Congress' power to regulate Indian affairs shares the "special nature" that the Court saw in Congress' power to regulate interstate commerce. 491 U.S. at 19, 109 S.Ct. at 2284. Convinced that IGRA abrogates states' Eleventh Amendment immunity and that Congress' power to regulate Indian

---

**8.** "The power over Indian affairs is unusual in our federal system because it includes general federal authority to legislate over health, safety, and morals. Examples of the rare instances in which Congress exercises similar powers include the administration and government of territories and possessions, the District of Columbia, and federal enclaves. Consequently, although in practice Congress leaves much governing authority to the tribes, federal power over Indians is 'plenary' in the sense that in Indian matters Congress can exercise broad police power, rather than only the powers of a limited government with specifically enumerated powers." *Felix S. Cohen's Handbook of Federal Law* Ch. 3, § C1 at 219–20 (Rennard Strickland et al. eds. 1982).

**9.** Though it is not a *per se* rule that the states lack jurisdiction over activities on tribal land, "[t]he presumption and the reality, however, are that federal law, federal policy, and federal authority are paramount in the conduct of Indian affairs in Indian Country." *Seneca–Cayuga Tribe v. State ex rel. Thompson*, 874 F.2d 709, 712–13 (10th Cir.1989).

**10.** "[T]he power to regulate commerce includes the power to override States' immunity from suit." 491 U.S. at 14, 109 S.Ct. at 2281.

**1432**

commerce includes the power to abrogate states' immunity, the court denies the defendant's motion to dismiss for lack of jurisdiction.

IT IS THEREFORE ORDERED that the defendant's motion to dismiss (Dk. 14) is denied.